Case number 21-788, Bloomberg, L.P. Petitioner v. Securities and Exchange Commission. Mr. Bradley for the petitioner, Mr. Weinman for the respondent. All right, good morning, Mr. Bradley. We'll hear from you. Good morning, and may it please the court, I'm Keith Bradley representing Bloomberg, the petitioner in this case. The SEC has approved a restructuring of the system for getting investors' reference data on corporate bonds. That's a major change, and the SEC's assessment of it is troubling. We talked about many different problems in our briefs, but here I'd like to focus on just two. First, the economic consequences, and second, the lack of evidence of an actual problem. First, the economic consequences. The SEC's decisions in this area are really about dollars and cents ultimately. Underwriters are going to have to submit data to FINRA accurately and in a short time frame. FSMA, that's an association representing investors and underwriters, told the SEC that compliance would be difficult, if not impossible, in many circumstances. The order doesn't even discuss that concern. Instead, the SEC simply asserted that the cost is small enough compared to the benefit, because underwriters are already providing their data to data vendors. What happens today is an iterative process in which vendors work with underwriters to organize the information, to check it, and verify it, and prepare it for traders. Under the new rule, an underwriter has to do that work for itself. It's as though, because you hand over a bag of receipts to your accountant every year, the SEC thinks that it takes no more effort to prepare your own tax return. Can you explain to me why this might be a substantial problem? I mean, just looking at this from 200,000 feet, I'm struck by a couple of things. One is, it's just very hard to believe that in the digital age, it is really that hard for people who want to sell bonds to disseminate to the market really basic information. I mean, some of these data fields are things like the interest rate, the number of payments per year, the yield rate. I mean, people make fortunes buying and selling stocks based on information flows literally in microseconds. I mean, the idea that it's just an insufferable burden to disseminate data about when the bond is going to become due, it just seems hard for me to fathom. So, a couple of points to your honor. First is, bonds are different. You're right about stocks. Bonds are different in many different ways. And we're not talking about the ongoing flow of bonds where whatever trading might happen in the secondary market over the course of- No, I understand. But primary market- We're talking about the- Yeah, go ahead. Sorry. I apologize. So, what SIFMA said is, look, we've got multiple bonds coming out at the same time. Things are changing up until the last minute. And it's hard to get it out as you have required it, like before we do the very first trade. This is actually different from what the committee had actually recommended, which was make sure you give it to FINRA before you give it, at least no later than you give it to a reference data vendor. What FINRA is requiring is a certain degree of speed and obviously what comes with that accuracy. Second thing is, we're not claiming that it is insuperable. Our point is that there is a system in place. People are getting data. And in fact, I would say there's a fundamental illogic here, because the SEC has found that the underwriters are all giving their data to data vendors already, which makes sense. But there's also record evidence that the market is not as efficient in terms of the dissemination of data because you don't have a large percentage of people participating on day one. And so, why isn't the SEC entitled to look at that? They convened an entire committee of people from different aspects of this market to address what they think is a problem. So, I guess I'm a little confused as to your suggestion, both here and in your brief, that there's really nothing to see here in terms of the initial concern. So, one thing that I find really striking here is that in principle, this is all in service of investors and traders and bond issuers to make sure that the investors and traders have access to the data that they need. The investor and trader representatives in this case opposed or were dubious of the proposal because their reaction was, we don't see why this would be particularly more effective or efficient than what we have today. The record evidence that you're referring to is record that some data vendors have trouble getting access to data or some of them find their process inefficient. Everybody agrees that Bloomberg is the largest in this market and there is no evidence that its process is inefficient. There's also no evidence... I'm asking about the statistical evidence about the numbers of trades that are actually occurring in this market, not just whether the data vendors themselves feel like the non-Bloomberg data vendors feel as though they are getting information from the underwriters, but sort of a bird's-eye view of how many people are participating in this market from the beginning and what are the impediments to them being able to do so. And my understanding, and you know I'm certainly not an expert in this area, my understanding is that there was data that indicated a fairly low percentage of first day, first hour trades and that at least some information before the committee indicated that that was because people felt as though they were not getting access to the necessary reference data to enter and participate at that first stage. Am I wrong about that? I believe so, your honor. I want to talk about the statistics because that's very important. Okay. So far as I know, there is one piece of statistical evidence that purported to support this rule and it is a graph that FINRA submitted that purports to show, as you said, a certain gap in the timing of trading. Bloomberg responded to that to demonstrate that the apparent gap in that data is due primarily to sort of data selection issues because there are differences in what, and this, first off, FINRA's data is entirely about trading by what are called alternative trading systems. There's a certain kind of platform, trading market. There is and has been a, I don't want to call it a skew, but those trading platforms trade more large bonds than small bonds. That is largely what's going on in FINRA's data. It is an artifact of the data which Bloomberg demonstrated with its own statistical submission and the SEC responded to this. The SEC considered that sole piece of statistical evidence and said, we're throwing them both out. None of this is really relevant because the problem here is not about alternative trading systems. It's about others. So, and aside from that, your honor, I'm not aware of any statistical evidence that shows a gap in access, shows an inefficiency, shows a lack of availability of data, any statistical evidence that supports this proposal. Is it possible under the current system for an underwriter to disseminate the information about its bond to the entire market by giving that data to only one vendor? Or do they have that, is there a world in which they can do what they want to do? They, the underwriters, meaning control the data, make sure it doesn't get inaccurately reported to a bunch of different people. We want to give it out one time. Can they give it out one time and reach the entire market under today's rules? So, I have to be honest, I don't know and the record doesn't say. I believe, so there's evidence, for example, of an underwriter that says they give their information only to Bloomberg and they do that because Bloomberg is the most accurate source. I suspect that they would do that because they think also they can get to the entire market and there is conversely no evidence that of any investor or trader that has ever lacked access to information about any particular bond. So, I think that what you asked- The entire market subscribes to Bloomberg's service, right? If that were the case, yes. If they only gave it to Bloomberg, that's right. Now, if they gave it to two or three, maybe they would get- That's just how, one of the ways Bloomberg makes its money, right? We are certainly, I acknowledge, we're here because we value the revenue, Bloomberg values the revenue. That's why it has standing here. But this is ultimately the court should be concerned about the investors and whether they- That's why I'm asking this question. I'm asking the question because what I understand the problem of asymmetry and the concerns about inefficiency to be is that on the first day of trading, everyone in the market does not have access to the same information. A lot of people have access to information because Bloomberg is such a dominant player in this market and Bloomberg allows for people to have subscriptions. And so, if you subscribe to Bloomberg, you're going to get a lot of it. But not everybody subscribes to Bloomberg. And I understand the problem to be that that creates an asymmetry in the market in terms of who has the information to be able to the rule was designed to deal with that. The rule was designed to set up a system to make sure that everybody gets at least certain basic elements with respect to all of these trades. And of course, Bloomberg can still continue to operate and give more and give better and give easier or whatever. But sort of, you know, I was thinking about this like in the law, you know, our opinions are up on our website every day, all the time. But then there's also Westlaw and Lexis and those services, you subscribe to them. And people still do subscribe to them, even though they could just come to my website, our website on the court and get the opinion. So, this is essentially the agency putting the data up on the website, letting everybody basic core get it. And I don't understand why that's not okay under these circumstances where they see the problem access being limited. I seem out of time, but I would love to give you a response to that because there is a response. Please, please go for it. So, a couple of things. One is a, so if an investor, FINRA has its system, an investor that wants those data will have to go and buy them from FINRA. That's not different from buying them from Bloomberg. It's just replacing one source for another source as far as that goes. And the investor representatives in this proceeding were generally concerned that the FINRA version will be actually more expensive and less efficient. There's no evidence that it will be there because don't we see a difference in so far as Bloomberg might not have everything. I mean, in the world in which underwriters do only give it to one source, most of them, 90 some odd percent of them may give it to Bloomberg, but we do have some who are giving to other vendors. That's why a person today would have to cobble it together from Bloomberg and these other vendors. So, it's not a one-for-one trade between paying for it from FINRA versus paying for it from Bloomberg because FINRA is going to have more information, won't it? It has the universe. Well, respectfully, Your Honor, there actually isn't evidence in the record of bonds for which Bloomberg doesn't have the that there would be some set of, like there actually is not evidence of that. But if I could go back to your PACER analogy, there's a critical difference. PACER, getting support, getting your opinions is free to the public. And why is it free? It is supported by tax dollars. It is supported by fees paid by litigants. It's not free. It's just that there's been a public judgment to support it in that way. The FINRA service is also not going to be free. And it is going to replace a system that already exists, which if that is a cheaper and more efficient way, that would be one thing. But the SEC expressly refused to assess whether it will be. Yes, but that argument I find troubling as well because those are the same thing. In other words, FINRA is a government agency. I never understood the argument that you're making that the government agency has to assess the cost to itself of setting up a system. That's not really the way we ordinarily do this. Congress has made a determination that the agency needs to take steps to enforce the Exchange Act to promulgate whatever system is necessary to ensure that the State Exchange Act goals are satisfied. And the cost of doing that is sort of baked into it, just like the cost of the court setting up a PACER is part of being a government entity. So, I don't really understand that argument in that sense. Let me explain that as well. So, one thing is that government agencies, when they do cost-benefit analyses, they do assess the costs to themselves because when they take on a new thing that's going to cost the public more money, and we'll be happy to submit some examples of that. Second thing is FINRA is not the government. The SEC's argument is exactly the opposite, that the SEC shouldn't have to think about the cost because FINRA is private, which is true. What do we know about how FINRA is funded? Is it primarily through government taxes and appropriations, or is it through dues imposed on members? It is through dues on members and fees for services such as the fee it might charge for this. And do you have any authority, one way or the other, on the extent to which a cost-benefit analysis has to incorporate costs to the government, just assuming for now that we treat FINRA as a government regulator rather than a private regulated party? I didn't see much in the briefs, one way or the other, on that question. I think there is not much in the briefs on either side. I don't off the top of my head have the cases on that for the government, but we'll submit some. It is routine for agencies to think about their own costs, though. So, we'll find something. A little bit, but that's a little bit different from saying that they have to, either as a matter of APA law or under, I think it's Section 3 of the 34 Act. Agreed. It is different. But I will say that, especially for FINRA, this is what we just said. This cost is coming from somewhere. It's coming out of broker-dealers who are the members, and basically every broker-dealer has to be a member. So, it's going to be dues to members, or it's going to be fees to subscribers. It's going back out to the market participants. So, it seems to me that as a matter of, you know, this court logic in cases like Business Roundtable and Chamber of Commerce, to refuse to think about that cost means that you are just sweeping an important aspect under the rug. Is it really being swept under the rug? Because once FINRA determines what it's going to charge for this, there will be an opportunity for FINRA members to object because they could say, you know, you are taking some of our dues to subsidize this activity, and we think that that's inefficient. I mean, all those arguments are on the table later, right? Not quite all of them, Your Honor, because, and this is, in fact, the SEC's interpretation of the Exchange Act. It says that that decision is about the allocation of charges. The rule under which FINRA undertook that it's going to build the system and operate it, take in the data and disseminate them, is the rule that the SEC approved in this case. This was that decision. Later on, there can be debate about how the cost gets parceled out amongst, you know, whether it goes in fees to subscribers or it goes, but the fact that FINRA undertook that cost, that has happened. And if the SEC decides that really assessing that at this moment is not really right for us to decide since we don't know what that is, I mean, isn't that the better way of saying that what the agency has decided so far is arbitrary and capricious? And if we say that making that determination right now is not right, then that would necessarily preserve it for you or others to make that argument at the second stage, right? Well, to be candid, Your Honor, this court might never have the opportunity for it, because as you may know from previous decisions of this court, if the SEC looks at a, gets a fee proposal and then takes no action on it, that is not reviewable. So as far as this court's actually looking at it, this is possibly, in fact, likely the only moment. But in terms of whether it is, like, whether it is right, the court has said again and again. Just to respond to that, you're telling me that FINRA couldn't petition for, to revoke the rule or petition for rulemaking or something, and then if the SEC denies that, that that wouldn't be an avenue to get court review? Or that that's not possible? So as far as a fee rule goes, the process is that FINRA will propose a fee rule. It is entitled to put a, make that rule immediately effective, and if the SEC doesn't respond, and then the SEC, you're right, we could petition the SEC to undo the rule that's in place today, but it's easier to review the, you know, to review the rule the first go-round, which is exactly what we're asking. In terms of whether it is right, the, this court has said again and again that just because you don't know exactly what the cost will be is no excuse for not looking at it at all. I think we can all agree that the amount of the cost is part of the economic consequence of this. Yes, and yes, and so to that extent, the rule is right for consideration, but my question, I think, about this is, weren't the broker-dealers on the initial committee that looked at this, weren't the investors a part of it? You're now suggesting that the SEC has done something inappropriate by not considering the fees and the ultimate cost that will impact those groups of market participants, but they were involved in the process. Everybody knew there was ultimately going to be a fee, and they unanimously agreed to this proposed rule, so I guess I'm just confused as to why it is that you are suggesting that the SEC did not act adequately in its consideration of the fact that there will ultimately be a fee and its determination that it will control those costs eventually down the line. So the, your point about the committee's consideration is a very interesting point, Your Honor. First thing is, the recommendation that the committee made is actually different from what the SEC approved in important ways. For one thing, the committee proposed something about the fees that actually really wouldn't have been lawful under the SEC's interpretation of the Exchange Act, and for another thing, the committee proposed a different timing that would have made things much simpler for underwriters. Second thing, though, is that the, while the committee was universal on that actual proposal, one member of the committee wrote to the SEC during the comment process to say, what is that, sorry, the recommendation they wrote into the committee during the, to the SEC in the comment process to say, the actual proposal is a bad idea because you shouldn't put this in sinners' hands. Another economist that the SEC relies on very heavily says, this is good, this is going to be a good thing so long as the data are free, which is sort of magic thinking that, again, sweeps that cost under the rug. Investors, referring to the credit roundtable, commented to the SEC that, yeah, we would love more data and more transparency, but the initial cost that FINRA has proposed, at that price, it's not worth it. So, all of which are examples of why it's not enough just to say we had a committee and they told us this. The SEC has an obligation to think about the comment record and the evidence on its price. And everyone, you know, lots of people object. The SEC, at that point, can suspend it and this program basically, you know, is over, right? Unless FINRA comes up with a better fee structure. So, I think what would happen if the SEC disapproves the fee rule, the fee when it happens, is that the rule that we have today stays in place unless the SEC takes further action. The SEC is empowered to abrogate one of FINRA's rules. They could do that, but it would require that active decision by the SEC with all of the appropriate analysis of that. And then, again, the market, the underwriters, the issuers, the traders are going to have this out there that there's a system coming, we have to comply with, FINRA is going to build it. And in the meantime, FINRA will have incurred this cost. At some point, they're going to have to figure out what it costs to build and run a system. This was really the time to do it. Would it make sense for us to hold this case in advance until we get the fee proposal and then we could, if you chose, file another petition at that point, or we decide it at that point? Well, I would rather that you vacate the order that's at issue here, but I want to remind you, Your Honor, that most likely we can't file a petition, because if the SEC accepts the fee rule, that's something that this court has said it can't review. So, which brings me to, this is our shot to get review of the economic sphere. I don't, but I still understand, I still don't understand, Mr. Bradley, why this is your shot to get review of the economics. Because that aspect of this rule, which is totally promulgated, setting up a system, it says there will be fees, and the fees will be evaluated at a later date. Why don't you have the opportunity once the fees come into effect to say something about it at that point? Because under the Exchange Act, yeah, yeah, it is. Under a Dodd-Frank Amendment to the Exchange Act, if the SEC lets the fee rule stand, that is not reviewable. If the SEC rejects the fee rule, FINRA could challenge that, but nobody can challenge the SEC's decision, like, decision just let the fees go into effect. But there can be a separate, isn't there judicial review of the fees apart from this particular dynamic? No, no, there is not. And we cite some of these cases in our brief, but this is the Net Coalition line of cases, which have closed off, and, you know, it's not this court's fault, I mean, Congress made that decision, but that, those avenues of review have been closed off. But just to be clear, it didn't close off, I didn't think, your client's ability to file a petition for a rulemaking to set aside the fee. I assume that is correct, that we could file a petition for that, but I'll point out that the SEC's assessment and this court's review of that is very different. You know, this court's review of the decision, shall we have this system, is whether it was arbitrary and pernicious not to have, you know, to have this system. If we file a petition, the SEC says, no, because we have the other priorities, the review of that, of the denial of that petition is a very different animal. I understand that it's a different type of review, it's kind of a different standard of review, but that's different from saying that it's unreviewable. Well, so the SEC's decision to leave the fees in place is unreviewable. What you're suggesting is that after that happens, we would be able to petition the SEC to have it undo that decision, and that is something that I think this court, it's not clear whether we could do that and get judicial review of it, because of what this court said in the Net Coalition cases. I would like to think that we could get review in that circumstance, but again, and you would be reviewing the decision, you know, the SEC's decision to allow the fees and allow the system to go forward with that fee structure, that in itself would not be reviewable. Judge Katsas, Judge Jackson, any further questions at this time? Just one more quick practical question. From the perspective of the broker-dealers, they obviously want to get information out to the market, they collect the information under current arrangements, they disseminate it through Bloomberg. Is there any reason to think it would be more burdensome or unattractive to them if that system were replaced by one in which they do all the same things, except then they disseminate it to the market through FINRA? Yes. Why? There are a couple reasons. So, first thing is, with respect to their transition through Bloomberg, it is voluntary on their part. They are, Bloomberg, as a data vendor, and every other data vendor who does this, it's our job to do this in the way that is most We are doing, Bloomberg invests to make sure that it is easy for the underwriter. The FINRA system, it has to be, the underwriter is responsible for the accuracy of that and the timing of it. So, there is a compliance and cost and a system building cost to get in the place where you could do that and operate that on an ongoing basis that is getting shifted from data vendors. Are the underwriters joining with you in this opposition to the rule? I would think they would be able to speak for themselves concerning whether or not the shifting of costs is really a problem, and I'd understood that they were also in agreement, at least as represented on the committee. The committee, you know, the court, neither the court nor I know is how the SEC chose people on the committee and whether they are representative or not. What I will tell you is that the trade association that is the largest representative of underwriters opposed the proposal. They are not petitioners in this case. We're the only one. They commented three times, which is kind of a lot for the context, and the gist of their comments was precisely, this is burden on us. Please don't do it this way. So, these are the SIFMA comments that are in the joint appendix. All right. Any other questions for Petitioner's Council? All right. Thank you, Mr. Bradley. You exceeded your time. We'll give you some time on rebuttal. Let's hear from counsel for the SEC, Mr. Wyman. Thank you, Your Honor. May it please the court. My name is Theodore Wyman, and I represent the Securities and Exchange Commission. FINRA has proposed to collect and consolidate a limited range of data from a subset of its own members for consolidated dissemination to the public. None of FINRA's members will be subject to the new rule opposed it, nor did the private subscription services who currently provide their own comprehensive data services to the public, except for Petitioner Bloomberg, who seeks to maintain its entrenched superior access to this information. Yet, Bloomberg points to virtually no evidence in the record that is even arguably at odds with the SEC's findings, nor any relevant evidence that the SEC failed to consider. In Bloomberg's argument, they put almost decisive reliance on the comments of SIFMA, which were certainly not at this degree of focus in the briefing. And I think if this court looks at SIFMA's comments, they don't support the argument that SIFMA contended this was difficult, if not impossible, to achieve. SIFMA certainly weighed in on the analysis of the rule and the proposal and was hopeful that the system would be more automated. They said that they were concerned that it would be challenging to do, and they hoped that FINRA would actually invest more in the system to make it easier for them to submit information. Of course, that's what they want. But what the commission determined is the cost relative to the current environment, that is, what underwriters currently do in providing information to Bloomberg, there will be minimal cost. That's supported by the advisory committee, who actually contained several SIFMA members, had underwriters, had traders on it, 23 members from across the industry. And the advisory committee undertook its own investigation and gave its own views. And the conclusions that it found were that the underwriters were not concerned, including those on the committee. And of course, they haven't filed anything here or suggested that this would impose significant costs on them to comply. So that's simply not supported in the record. I think there's a few points to respond to that Bloomberg just made. One would be that there's simply no problem in the market, no access problem, and that's not supported by the record. Well, that's not the case. I mean, Bloomberg concedes that vendors have data access problems. There's no dispute that those vendors have subscribers. That vendors currently have subscribers. Other vendors provide services to customers. Ergo, those customers are not getting complete access. Now, the reasons why everybody doesn't subscribe to Bloomberg, we could speculate. But the fact is, everybody doesn't subscribe to Bloomberg. Nor would that necessarily be a good thing if there were only one private supplier that monopolized the information. The fact is, there is a data access problem in the market. Can I just clarify, Mr. Wyman? I'm just trying to understand your argument. So the data access problem that you are homing in on, and that apparently the record supports, is data access by competitors of Bloomberg? To be clear, Your Honor, the data access problem is ultimately by market participants. Bloomberg concedes that the sort of intermediaries have data access problems. And so that is another piece of evidence that shows why this is occurring. But ultimately, it's about the data access problems faced by the market participants who get it through trading platforms and vendors, ultimately. But it's just- Mr. Bradley says there's only one piece of evidence that he identified in the record that speaks to the statistics of people entering the market, and that that's not something that the SEC could have or should have relied upon. Can you talk about that? Sure. I believe the opposing counsel was referring to the discussion about alternative training systems, a form of e-trading venue. Ultimately, that's a subset. And there was an argument about whether that subset, there's a data access problem for those platforms. But the commission ultimately determined that that data was inconclusive. And even if you accept that Bloomberg's argument that alternative trading platforms don't face this issue, there are other e-trading platforms that weren't addressed by that statistical information. And beyond e-trading platforms, the market as a whole, there's other participants in the market that had data access problems. As to whether there's statistical evidence as a whole, the record doesn't have statistical evidence of that nature on either side. And so the commission conducted a qualitative analysis of the evidence that was before it. The views of participants in the market, who had the advisor committee, who had three rounds of opportunities to make comment, the commission took what was before it. In Prometheus Radio last year, the Supreme Court sort of reiterated a view that this court has said since the Chamber of Commerce, at least, which is that an agency is now required to conduct its own empirical analysis, still looking for statistical information. That's not submitted in the record. There weren't competing statistical reports here. There was one-sided evidence that data access problem among market participants. There was an explanation for that, which is that the intermediaries can't get the information. That's where the data vendor access problems come in. And Bloomberg conceived that the intermediaries for a lot of this information can't get data access. So with that wealth of information, that was enough to make the judgment that in fact- Bloomberg also says that everybody can have it. Just subscribe to me. Why are they wrong about that? I mean, as long as they're providing adequate, accurate information concerning these trades, and the vast majority of underwriters are actually providing their data to Bloomberg through systems that Bloomberg has set up to make it easy for them to do it, what really is the problem here? Well, there's two points I would say to respond to that. The first is, if that were true, that would only support the notion that this rule is justified by the competitive benefits that it would bring because it would increase competition in the data services market simply by Bloomberg's own admission. But I think fundamentally, in terms of what this means about data access, nobody disputes- Bloomberg doesn't dispute that there is a data access problem currently. That is, that vendors can't- they don't dispute that other vendors don't have complete data sets. They don't dispute that those vendors, for whatever reason, have subscribers. And that those subscribers, ergo, do not get the whole tranche of data. So if Bloomberg alone is the solution to this market problem, it simply hasn't solved it because it is not providing universal access, whether that's because of the prices they charge or, you know, allegations of anti-competitive conduct which have been made. The commission didn't find that. But, you know, the commission didn't go into the reasons why Bloomberg has this dominant advantage, but they found- or that, you know, some people are not getting this information by virtue of not subscribing to Bloomberg. But the fact is, people are not getting the information. There are people who subscribe to other services for price or whatever reason, and they are not getting full access. And of course, people who don't subscribe to anything at all, they're completely shut out because there's just no way for them to access the real core information. And that's the key here. You know, there's no evidence- you know, Bloomberg, I think, allies the distinction between the core evidence and the comprehensive services that are provided. The data vendors, they compete by providing comprehensive services with add-ons, analysis, a whole dataset, and much more data beyond the 32 elements here. These 32 elements are just the gateway to access the market, the core stuff, the name, the interest rate, the maturity date, just this key stuff. And that stuff is inaccessible for many people. You have to- I guess Bloomberg's saying you have to subscribe to Bloomberg, but, you know, there's reasons why they don't, apparently, because not everybody does subscribe to Bloomberg. Can you just help me with the basic conceptual question I asked your friend? On the other side, which is, this is extremely basic information. No rational investor would ever buy a bond not knowing the maturity date or whatever it is. The people who sell the bonds, the issuer, the underwriter, people in the secondary market, whoever it is, have every the information. Yes, Your Honor. And in the computer age, massive amounts of information flow very quickly and at very little cost. So, you put all those things together, it's just a little hard for me to wrap my head around why there's any problem here at all. Well, you know, I think it comes down to timing, honestly, Your Honor. I mean, it's both a matter of timing and- but the fact is that there's a very- the record shows that there's a limited time between when this stuff is going up, when underwriters, you know, they have to collect the data and manually input it to be able to send it out, and, you know, they have hours maybe before it hits the market. And so, you know, this information does get out over time, but it's simply too late to make an impact for that really key heavy trading period when this trading first begins. Who buys the bond without knowing all this stuff? And the- I think they don't. I think that's sort of the- what this gets at is access to the market. A lot of people are shut out because they can't get in on that first hour of trading. They have to wait till later or not, you know, by the time, you know, they have access, they simply- they missed out on that trading period. Why wouldn't the underwriter want to blast this to everyone in the world to pump up demand and therefore price? I think they- yes, Your Honor. I think they do, and this is the way that now they can do it more easily is through their organization, FINRA, which represents them. But under the current system, it's sort of an entrenched system where, you know, you have to put all the data in and you have to send it to different people, and the more- and I guess different vendors might have different systems, so you have to maybe put the data in in different ways. The record showed that there was a risk of, you know, by- you have to redo it, and that created risks of errors by retyping. Right, but I mean, another explanation of what's going on here is system is very efficient, and Bloomberg is just doing this well, performing the dissemination function well, which is why everyone uses it. And, you know, if it were just- if the economics seemed like, you know, debatable question either way, you win. You're the agency. You get a degree of deference. I'm just- I'm just struggling to imagine the world in which there are these, you know, huge cost issues or collective action issues, like, you know, advertising what the interest rate on the bond is. Yeah, yeah, your honor, I was surprised on looking into and getting into the record in the market that this was an issue, but it's supported by substantial evidence in the record that this is simply something that underwriters, you know, they get it out to one and they move on to other concerns in the limited time they have that day. So, I think it's about the timing with mostly and what the priorities are, and they're simply diminishing returns and risks of errors by, you know, blasting it out, whereas a centralized system like this really resolves that, and I think it shows why it would be not difficult for them to comply with providing this information. Your friend on the other side's statement that the underwriters objected to this proposal and think that it's a bad idea to concentrate this responsibility within that. Your honor, I don't think that's supported by the record at all. I believe they're referring to SIFMA's comments, which were far less, you know, decisive and to that end than they're suggesting. The underwriters were represented on the advisory committee. They didn't file, you know, individual underwriters certainly could have, you know, opposed it in this court, and they simply haven't. The SIFMA has simply, you know, obviously they want the best possible system, but what they've asked actually is FINRA develop, you know, more automation, more and make the system even easier for them to comply, but that doesn't mean that they oppose the concept of this, and that's not, that's simply not supported by the record. Does Bloomberg have a reason to be concerned that based on the assumption that underwriters only want to get this out accurately to one person and then move on, consistent with this new proposal, they will give it to FINRA alone, and therefore, we will have less competition ultimately in the market at the reference data vendor stage, that Bloomberg will lose, the other vendors may lose, because everybody's just going to go to Right, well, your honor, a couple points. There's no evidence in the record that there's a competition in a specific market for 32 pieces of core information. The competition among vendors is at a much higher level with comprehensive databases, comprehensive products to, you know, to parse that information, and so, and I think Bloomberg's argument ignores that vendors will be able to access the information from FINRA and incorporate it into their own offerings. This is not something where FINRA market participants are required to go to FINRA, and vendors will be allowed under the terms, they will be allowed to take that information, put it, feed it into their own system, and then provide their own comprehensive system that at least has that gateway key 32 pieces of information that lets sort of everybody get access. So, I think the commission found ultimately that this will, this is very well could increase competition by allowing more vendors, decreasing the barriers to entry, allowing them to sort of get the bare minimum you need to really compete, and the commission also found that, you know, even if the information, ultimately, the underwriters don't provide it to Bloomberg, Bloomberg, which is found, it's possible that they will continue to do that, because they're going to be providing other information beyond the 32 pieces of information that are here, and also updates over the course of the corporate bond. They're still giving information to cut out 32 pieces of information, just because they already provided it to FINRA, but even assuming that, the commission said, even if that happens, it'll be minimal burden, because this information will be available from FINRA. They're pricing it as a utility with a cost basis. That price will be reviewed for reasonableness later by the commission, and Bloomberg, contrary to what Bloomberg suggests, there will be an opportunity. This court in NASDAQ last year in the NASDAQ case rejected the claim that there will be no judicial review available. It'll be, as Judge Wilkins pointed out, any party can petition this for rulemaking, the commission, and if it's rejected, to change the fee, and it would go to this court, and- So, you don't see any problem with the deferral of the fee consideration as Bloomberg sets it up, and I mean, do we have, there's, one could conceive of it as maybe a ripeness problem, but I'm struggling to see why that's so, and so, can you speak to that aspect of it? Yes, Your Honor, the proposal under review is a reporting requirement. I mean, it's a reporting requirement to get the data from the underwriters with the view of creating a system to distribute the information and charge a fee, and the commission conducted analysis as required by the statute of whether that system, a fee-based system constrained by reasonableness and commission review later, would be as consistent with the Exchange Act. There's no requirement that a fee, the fee, the future fee to be proposed be included in this initial rule. There will be a second stage for that, but even if it were here, nothing would stop FINRA from proposing an amended rule. FINRA could have made the system free now, and in a year, come back and said, under the same process, 1983, that now we're going to charge a fee. This is Congress's system. Congress, it used to be that, you know, there would be pre-launch review of fees, but Congress changed that, and the system it created in 1983, it says the establishment of a fee or the amendment of a fee is through this, can be reviewed, can be proposed through this process that that would be later. So, there's really nothing for the court to consider now in terms of fees because the current proposal doesn't alter, amend, otherwise affect the fees charged by FINRA, and so it simply does not. Don't you have an obligation now to consider economic impact of this agency action? Absolutely, Your Honor. And it seems like it's not, you know, if you imagine that FINRA stands up a system that they're not wasting, they're not wasting cost, it's efficient. You know, they do it as best they can, and therefore, under normal utility principles, the costs could appropriately be passed on, but it turns out to be more expensive than the Bloomberg system, right? Under normal cost without compensating benefits, whatever, right? Under normal cost-benefit analysis, if those assumptions are right, you should have rejected this proposal now, and the escape valve possibility that if they build their system wastefully, you won't allow them to pass on all the costs is not fully responsive. Well, Your Honor, I understand the argument there, but I think it fails in a couple of ways. I mean, first of all, I think you would look at the statute, which does not require the commission to consider, you know, the impact on a self-regulatory organization's budget, right? They'll get to the economic impact, but it's simply, you know, well, FINRA doesn't need to come to the commission to upgrade its computer systems. I mean, there's a whole budgetary system, I believe, and it's not on the record that, you know, some of this is supervised in different ways, by example, or maybe there's different oversight, but they don't have to go by rule for every internal expenditure, and I think, obviously, in proposing this rule, they're going to be undertaking this cost, and I think you would look at what are the ways in which this could potentially impact the market, the economy as a whole. The commission looked at that, and the commission found that there's simply no evidence in the record that some of that will be reviewed by the commission in dues and fees proposals. I mean, that's what the Exchange Act says under Section 15A. It says you look at the way cost, I mean, there's no dispute that costs are relevant in so far as they are passed on into the market, essentially, through fees and dues. That would be the 15A analysis, and perhaps a broader economic impact, but there's simply no evidence here in the record. Bloomberg hasn't put forward any. Bloomberg says maybe it'll cost a billion dollars, and they'll have to be billed out by the federal government, but there's no basis for that, so I think you would look to the record, ultimately, and there's nothing in the record that suggests that this would be some enormous undue cost that would go beyond the bounds that would impact the market. It's simply an internal cost, kind of a usual internal cost that you wouldn't... I think it would require evidence that sort of an internal cost would bleed outside of the normal budgetary process for a health regulatory agency and kind of create this to support that challenge. How is FINRA financed? I mean, it's got to be through dues or fees, right? Dues and fees, Your Honor, and if dues and fees were ultimately increased because of this, that would be... all dues and fees proposals are reviewed by the commission, and so, you know, under the theory, I understand what you're getting at. So the cost of working assumption, you put aside the billion-dollar freakish extreme hypothetical, the working assumption is that the costs of building up this government alternative to Bloomberg is going to be borne by the broker-dealers who are charged fees by FINRA. Subject to commission review for reasonableness, and again, it has to comply with the statutes. It can't be unjust and unfair. All the requirements of Section 15a apply, so that will ultimately be determined, and so I guess the case that Bloomberg is saying is suggesting is what if the commission rejects it, and so it's not passed along to the market, and it's only FINRA keeps it internally, and that's really the limited set of situations in which Bloomberg is saying it's sort of speculative here, but the reality is, you know, there's not evidence that FINRA's budget, whether it's surplus, whether they can afford this in the record, and there's no indication in the record that this would bleed outside of that to impact the economy in any other way. And there's also a practical catch-22, which is the understanding from at least what people have argued or that you all have argued, that we can't know the cost right now until we've built it out, so if the requirement, if the statutory requirement is that we take into account these costs up front, then this will never be done, then we can never have a proposal of any sort that might result in cost because we can't know until we've undertaken the project. That's right, your honor, and I think Bloomberg might say, well, you know, there could be estimates, but that's not in the record, you know, the commission has to go with what's put before it, and Bloomberg had plenty of opportunity to say, building this kind of system costs, you know, they could have submitted studies, anybody opposing the rule could have submitted comments, I think that's what Prometheus Radio, you know, sort of holds last year, the Supreme Court, you know, you've got to look at what comes in, and if the commission doesn't consider evidence that comes before it, then yeah, that's arbitrary and capricious, it's unreasoned, but if there's multiple opportunities for commenters to supply data, to supply comments and evidence, and nobody puts it forward, then the commission isn't required to somehow conduct an empirical analysis and find its own statistical information, it judges based on the record before it, and there was enough record evidence to show that this is not going to disrupt the market, again, it's a much more global view of the impact on the market, and the commission undertook that here. And I would ask your friend on the other side this question, but please answer if you know, let's suppose someone wanted to just purchase the core reference data for new bond issuances, from Bloomberg, and that's all they want, could they buy that today? Your Honor, you know, I've thought about that internally as well, you know, that, there's not record information, I think, on whether someone, Bloomberg can provide that, just provides just that 32, the 32 data fields, but I think that's sort of the point, there's not any evidence in that there is a market for just the 32 fields, what the record shows is that the data vendors provide comprehensive services, and this is just a subset that allows, essentially, all vendors to provide comprehensive services with the bare minimum you need to access the market, which means that all subscribers to them will now be able to access this information, and also people who don't want to subscribe to services, who only want those 32 pieces of information, could get it from FINRA if they wanted to. When we're thinking about the question of what categories of costs need to be considered, should we think of Bloomberg, I'm sorry, should we think of FINRA as a government regulator, or should we think of them as a regulated market entity? I think a regulated, I mean, they are a regulated market entity, they're closely regulated, but they're a self-regulatory organization. Because I would think, right, there's a, there's an interesting argument, I don't know the answer to this, that in doing a cost-benefit analysis, usually you focus on the costs and burdens, the burdens imposed on the regulated parties, as opposed to the burdens imposed on the government regulator. But you sort of, you undercut that, our potential argument for the SEC, by saying in your brief that we should think about this category of costs, not as costs by the government, but costs voluntarily incurred by the regulated, not regulating, regulated entity proposing the rule, and then you go on to cite Business Roundtable for this concept of self-regulation. Yes, yes. Well, I mean, I appreciate the candor, but that's even if you thought that pure government compliance costs are outside the cost-benefit, I'm not sure these costs would fall into the category. Well, I think the distinction is in the posture of the rule. I mean, in the typical case that I think you're referencing, the Commission is doing, is promulgating a rule that says, you know, the SRO has to do this, or someone else has to do this. Here, when the SRO proposes its own rules, the Commission's review is a little bit different, its role is a little different. You know, we don't have authority to rewrite the rules and make it better. It simply, is it consistent with the Act? If so, we approve it. And in this case, although FINRA is the regulated entity, it is a regulated entity, it is also the one proposing the rule for itself. And so in this context, I think it is comparable to a government agency taking on the cost, not because it's governmental or whatever, but because it's the one proposing the rule. It's choosing it voluntarily. So I think in that context, you would look at the fact that they are choosing to incur it voluntarily. And so it's not something that's being opposed on them by the government, by the Commission, through a Commission rule. If we think of FINRA as the government for these purposes, do you have anything more? I thought the briefs were thin on both sides on the question whether the cost-benefit analysis has to take account of costs of the government in administering the program. Do you have anything more on that? No, I'm not aware of that, but I do know that the overall analysis is about the economic impact. That's really the touchstone. What is the impact, the economic impact as a whole? And that may include cost benefits for regulated parties in cases, but it's really about the market impact. And here, the Commission looked at the market impact, which doesn't really include FINRA's internal budgetary costs. There's no evidence supporting that as a negative impact. Thank you. Thank you. All right. Any further questions? Judge Jackson, Judge Katsas? All right. We'll give counsel for the petitioner two minutes on the phone. Thank you. There's much to say, but I just want to touch on a couple things. First of which is, Judge Jackson, you're catch-22. There's no business in the country that would undertake a project like this before figuring out the cost beforehand. FINRA certainly can do that as well. They just didn't tell the SEC, and the SEC was willing to accept that. Second thing is that this is not like Prometheus Radio Project. The critical difference is the SEC was reviewing an application. This is an adjudication, an application from FINRA for approval, and the SEC's regulations say that FINRA had the burden. So, I want to quote you, from a decision that the SEC made just a couple weeks ago, rejecting a rule proposal. They rejected it from an exchange for a new kind of fund. Neither the exchange nor the sponsor provides any data or analysis to support its assertions, so we have to reject it. That should have been the answer here as well. There is no data. I agree. There's no evidence that this is going to be a particularly expensive system, because there is no evidence at all, and that was FINRA's burden. I just want to be clear. It was FINRA's burden to do what you're saying? To establish whatever the cost would be and support an analysis of all of the relevant factors that the Commission needed to consider. And that's because it's a private entity or because that cost was going to be passed through to its members. Because I don't see it in the statute. The statute has a lot of factors that the SEC is supposed to consider when it's determining whether or not to approve these sorts of things. As Mr. Wyman pointed out, and as I had observed earlier, I did not see anything in the statute about how will this budget of the self-regulatory organization, what are the costs to the self-regulatory organization itself. And you would think that if Congress intended for that to actually be a consideration, it would be there, just like all the other things. So what is it now you're saying that the SEC was supposed to require FINRA to say in this regard? I appreciate the chance to trace it through. Section 3F of the Exchange Act says that in a decision like this, the SEC was supposed to consider the effect on efficiency, competition, and capital formation, if I'm remembering the language correctly. The SEC and this Court have long interpreted that language to mean the SEC has to think about the costs and benefits of the decision. In this case, yes, the FINRA can go off and if it's doing something that doesn't require SEC approval for some internal operation, then of course the SEC doesn't have to think about the FINRA's budget. This is a case where the FINRA requires SEC approval because it is a rule change requiring underwriters to do something and saying that FINRA is going to provide this service. So that requires... The 3F is not the team A, B, where there are a list of requirements that the SEC needs to take into account in approving the rules of this kind of association. So first we have to determine whether 3F is even triggered here. I understand there's case law that interprets this language to be about costs and benefits, but it seems like quite a leap, even if we say 3F is involved and even if we say costs and benefits are required, to suddenly say that means that the self-regulatory agency's budget, the cost to the agency itself, is what 3F is requiring under these circumstances. Do we have case law that says that? I'm not aware of cases either direction about the budget of the self-regulatory organization. I don't think it's controversial that 3F does apply. It does say review of a rule of a self-regulatory organization. Yeah, so I'm assuming that. Let's assume it applies. Let's assume we have cases that say it means costs and benefits. The question is why does cost and benefits include budget of organization in this way? So the neither 15A nor 3F says, lists out the costs and benefits. You have to know what the costs and benefits are. You have to think about what are the practical costs and benefits in any given situation. Of course they are not spelled out in statute. In this case, the practical effect is, I think we all agree, Mr. Wyman and I agree, I think that the FINRA is funded from two sources. Like its internal budget is not, you know, does not magically stay internal. That is going to be a cost to the market one way or the other. So it is consequently, it is a genuine economic consequence. So it's not because the statute spells out here are 15 economic consequences, like here are 15 costs to consider. It says consider, you know, effectively assess the costs. And this is one of the costs. That's why. All right. And my point, I'm sorry. Judge Jackson, and then I have a different question. Were you done? Oh, I just had one little thing to say, which is just about the burden. The burden that being on the SRO is not, sorry, on FINRA is not from the statute. It is commission rule 700B3, which says very clearly that FINRA has the burden to provide the evidence needed to support the analysis. So that's what I was going to press you on, which is, we're, this is an APA case, right? It's done on a closed record. Even if I were to agree with you that this is the kind of cost the agency should consider, it's still a pretty big leap to say that the agency has the burden of developing the record on this point. Usually in a cost benefit situation, agency proposes some burdensome new rule, the regulated parties come in and put before the agency, the evidence of all the costs, and then 3F requires the agency to explain why it should proceed. Here, you all didn't put in any evidence, unless I'm forgetting, that the cost of this would be, would outweigh the benefits, right? So there's nothing in the record one way or the other on that point. So why does, why does the agency, why does the agency not win under, I don't know, I guess it was just general APA principles. They don't have to address a problem that is not developed in the record before them. So your honor, there is a, it comes back to this burden. I agree, the SEC was not responsible to develop the record. FINRA was responsible to develop the record. That is what the SEC's regulations say. And so what happened in the record was, we said, this could be very expensive. You should make FINRA tell you what the cost of it is going to be, and you should be worried that it is going to be too expensive. We were not, in fact, the only people to say this, multiple commenters did. And the, as I said, credit round table said, their original guess about the price they're going to charge, this is not going to be worth it. So under the regulations, the organization is supposed to be ready. Once, just once more, give me the, this might be important to me. So just give me that site. Where would I find the competition that the burden of developing the evidentiary record is with, on this point is with FINRA. Where would I find that? That 17 CFR 201, I believe it is. Yes. 201.700B3. Okay. And that is cited in both of the briefs. And you made this argument to the agency? We did. And so the SEC routinely rejects rule proposals from exchanges and others for lack of evidence. They just didn't hear. You would have to say it was arbitrary and capricious. Given this rule of law, it was arbitrary and capricious, or there was no substantial evidence for them to conclude that FINRA had met its burden to show efficiency. Yes. Okay. Can you just answer quickly? My question is if someone just wants this core reference data and that's all they want from Bloomberg, is there a process now where they could just obtain that only that from Bloomberg? I regret to say that I can't answer that question either. I don't know their products in enough detail to know whether you can buy just that sliver. What I can say is that the record shows that Bloomberg's product is available on the same terms, whoever wants to buy it. So we find it somewhat surprising. The SEC says that there are investors and traders that are subscribers to other services and therefore can't get what they want. There's a fundamental economic illogic to that. If they want it and there's somebody willing to sell it, I don't know why they can't buy it. But in answer to your question, Your Honor, I don't know if Bloomberg sells a product that is just the 32. Well, there's lots of things that want that people sell that I can't buy. But at any rate, those problems are my problems. Depends on the price. And of course, we don't know what the price of the stimulus system is either. So, all right. Well, thank you. We will take the matter under advice.
judges: Wilkins, Katsas, Jackson